## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **THE LOCAL SPOT, INC. d/b/a THE LOCAL and GEOFFERY REID** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **No.** |
| **WILLIAM B. LEE, in his official capacity as Governor of Tennessee, HERBERT H. SLATERY, III, in his official capacity as Attorney General and Reporter of Tennessee, JOHN COOPER, in his official capacity as Mayor of Metropolitan Nashville-Davidson County, and MICHAEL C. CALDWELL, in his official capacity as Chief Medical Director of Health for Metropolitan Nashville-Davidson County,** | ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

---

### COMPLAINT FOR DECLARATORY JUDGMENT
### AND INJUNCTIVE RELIEF

---

**COME NOW** Plaintiffs The Local Spot, Inc. and Geoffery Reid, and respectfully aver as follows:

### <u>INTRODUCTION</u>

1.      The government and citizens of the State of Tennessee and Metropolitan Nashville-Davidson County ("Metro") are facing a major health crisis caused by COVID-19.

2.      The officials and agencies of Tennessee and Metro, including and especially the Defendants, face very difficult, life-altering decisions related to responding to the threat and effects

–1–

of COVID-19.

3.     The  government is unquestionably afforded police power to reasonably address public health and safety issues, including such epidemics as COVID-19, and such powers afforded the State of Tennessee and Metro are set forth clearly in the laws, rules and regulations related to the control of dangerous, communicable diseases

4.     Notwithstanding, the major crisis and the police powers afforded Defendants, it is a well-established principle in our jurisprudence that state and local governments cannot contravene the inalienable, natural rights of the people as protected under the U.S Constitution and the Tennessee Constitution.

5.     The Defendants' plan of quarantining the entire population and closing all "non-essential" businesses has resulted in the unprecedented and devasting deprivation of citizens' fundamental and natural rights, including, the right to travel, the freedom of association, the freedom of religion, the right to be free from illegal seizure, property rights, economic rights and other civil liberties protected by the U.S. Constitution and Tennessee Constitution.

6.     Further, Defendants' efforts have resulted in economic devastation to the state and county. The Governor's office estimates that 15% of Tennessee workers have filed for unemployment, retail businesses have lost $870 million in net sales and Tennessee GDP has been reduced by $5 billion dollars.

7.     Plaintiffs likewise have experienced economic devastation, as has many other business owners. Plaintiff Reid is the sole owner and operator of a small bar/restaurant and live music venue, The Local, which was shuttered by the Defendants in the name of addressing COVID-19.

8.     Given the unprecedented deprivation of citizens' fundamental and economic rights,

–2–

Plaintiffs bring this cause of action pursuant to the crucial and unique concept of the separation of powers to achieve an independent judiciary review and subsequent adjudication of the constitutionality and legality of Defendants' orders and actions.

9. Plaintiffs respectfully submit that in depriving Plaintiffs of their fundament rights, ,Defendants' orders and actions were not the least restrictive means of addressing the spread and effects of COVID-19 as best evidenced by the unparalleled economic devastation caused by Defendants' orders.

10. Defendants have failed to use many of the mechanisms and authority afforded under the law to the government to handle deadly, communicable disease, to include, mandatory reporting by citizens who suspect they may have been infected, mandatory quarantining of those who have been infected, quarantining the susceptible segments of the population, monitoring those who have been quarantined and pursuing contact tracing and testing to ameliorate the spread of the virus.

11. Defendants wholesale approach of severely limiting citizens' travel and business activities constitute the unlawful deprivation of Plaintiffs' inalienable and natural rights protected under the U.S. Constitution and the Tennessee Constitution and such has been even more unprecedented and devasting than the effects of COVID-19.

12. Plaintiffs seek a declaratory judgment and injunctive relief that the Defendants' orders and actions set forth herein are unconstitutional and are otherwise unlawful and, therefore, Defendants must repeal and discontinue enforcement of their Orders to the extent they are unconstitutional or unlawful.

13. Plaintiffs further seek other remedies afforded pursuant 42 U.S.C. § 1983 related to the deprivation of their fundamental rights.

14. Plaintiffs do not seek to eliminate or negate the legal and scientific methods the

Defendants have employed or should employ to address the real threat of COVID-19, such as quarantining those who are infected, monitoring those who are infected, regulations related to protective equipment, such as masks and gloves, testing, contact tracing, social distancing or similar reasonable methods.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over all federal claims in this Complaint arising under the United States Constitution pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4), and under 42 U.S.C. § 2000cc et seq., which confer original jurisdiction on United States Courts in civil actions to redress the deprivation of rights, privileges, and immunities, as stated herein.

16. This Court has jurisdiction over the request for declaratory relief pursuant to 28 U.S.C. § 2201 and 2202.

17. This Court has pendant and supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367(a) and to the extent the Court finds such state issues are novel or complex, the Court has the authority to certify questions to the Tennessee Supreme Court.

18. Venue lies in this District pursuant to 28 U.S.C. § 1391 as the Plaintiffs and Defendants are located in this District and all events giving rise to this action occurred in this District.

## PARTIES

19. Plaintiff The Local Spot, Inc. d/b/a The Local is a Tennessee corporation formed and operating under Tennessee law with its principle place of business located at 110 28th Avenue N., Nashville, Tennessee 37203. At all times material hereto, The Local was a functioning, profitable restaurant/bar and live music venue which was licensed to serve food and alcohol by the State of Tennessee and Metropolitan Nashville-Davidson County.

–4–

20.     Plaintiff Geoffery Reid is a resident of Tennessee and owns a private residence and real property in Sumner County, Tennessee. At all times material hereto, Reid was the sole owner and operator of The Local.

21.     Defendant William B. Lee is the Governor of the State of Tennessee and primarily derives his authority and power from Article III of the Tennessee Constitution. The Governor can be served through the Attorney General and Reporter of Tennessee, to wit: Herbert W. Slatery, III, P.O. Box 20207, Nashville, Tennessee 37202. At all times material hereto, Governor Lee was acting in his official capacity and under the color of state law.

22.     Defendant Herbert W. Slatery, III is the Attorney General and Reporter of Tennessee. Pursuant to Tenn. Code Ann. § 29-14-107 and Tenn. R. Civ. Pro. 24.04, when the constitutionality of a statute is challenged, the Attorney General and Reporter shall be served, to wit: Herbert W. Slatery, III, P.O. Box 20207, Nashville, Tennessee 37202.

23.     Defendant John Cooper is the Mayor and Chief Executive Officer of Metropolitan Nashville-Davidson County (herein after sometimes referred to "Metro") and can be served in his official position at his principle place of business, to wit: Office of Mayor, 1 Public Square, Suite 100, Nashville, Tennessee 37201. At all times material hereto, Mayor Cooper was acting in his official capacity and under the color of law.

24.     Defendant Michael C. Caldwell is the Chief Medical Director of Metropolitan Nashville-Davidson County and can be served via the Chief Executive Officer of the county, to wit: Mayor John Cooper, 1 Public Square, Suite 100, Nashville, Tennessee 37201. At all times material hereto, Michael C. Caldwell was acting in his official capacity and under the color of law.

–5–

## FACTUAL ALLEGATIONS

**A.    DEPRIVATION OF PLAINTIFFS' FUNDAMENTAL  RIGHTS AND LIBERTIES**

25.    Plaintiff Geoffrey Reid is a long-time resident of Tennessee and has family and associations throughout Tennessee.

26.    Reid has owned and operated The Local Spot, Inc. ("The Local") since 2017.

27.    Reid funded the purchase and opening of The Local primarily with funds which he saved or procured.

28.    The Local is a small bar/restaurant and live music venue with approximately 3,500 square feet of space.

29.    Reid brought in many local musicians to play for locals and tourist alike and live music is an essential part of his business.

30.    Reid invested a considerable and concerted effort each day for the last two years establishing his business and building up a solid, loyal patronage.

31.    Prior to the Defendants' Orders closing his establishment, Reid was having a record year at The Local, with revenue up 56% from the previous year.

32.    Upon being closed by Metro's Orders, Reid fully complied with the Orders and immediately closed his business and he did not generate revenue between March 16, 2020 through May 11, 2020.

33.    Reid's business model does not include significant revenue from pick up or delivery as he derives most of his revenue from live music events.

34.    The Local's gross revenue primarily consists of sales of alcohol during live music events.  On average, The Local has between 28 to 30  live music events each month.

35.    Despite being closed, Reid continued to pay his employees as he felt a sense of

–6–

responsibility to his employees.

36.     Reid was required to continue to pay other costs and expenses associated with The Local, including, paying his rent obligations due under the lease, even though he was not able to generate revenue.

37.     Upon being able to apply for a loan through the federal Paycheck Protection Program, Reid did so, but the funds were depleted before he could be approved.

38.     Reid was approved during the second round of funding of the Paycheck Protection Program, but, to date, he has not received such funds.

39.     As a direct result of being closed by the Defendants' Orders, Reid has incurred significant monetary losses which exceed $200,000.

40.     Reid opened his establishment under severe restrictions on May 11, 2020 pursuant to Metro's orders.

41.     If Reid is not allowed to fully open The Local as a live music venue and bar/restaurant in the near future, it is highly probable that Reid will have to close The Local permanently.

42.     The continued enforcement or renewal of Defendants' Orders will cause irreparable harm to the reputation, good will and financial health of Reid's business.

43.     The Defendants' Orders have effectively functioned to seize and/or take The Local without any compensation to Reid.

44.     Reid has been effectively seized by the State of Tennessee and/or Metro by being Ordered not to travel intrastate unless it is "essential" as defined by the government.

45.     Reid has not been allowed to associate with others as a result of the Defendants' Orders.

46. Reid has not been able to continue to develop his familial relationship as a result of Defendants' Orders.

47. Reid has been unable and will be unable to pursue his chosen occupation of life as a restaurateur and entrepreneur as a result of Defendants' Orders.

48. Reid may be subjected to criminal prosecution as a violation of the Defendants' Orders is a crime and such Orders are unduly vague.

49. Reid has suffered other damages and injuries as a result of the Defendants' Orders.

## B. TENNESSEE GOVERNOR'S EXECUTIVE ORDERS

50. On or about January 19, 2019, William B. Lee was sworn in as Governor of Tennessee and pursuant to the Tennessee Constitution took an oath to support the Tennessee Constitution and the United States Constitution. *See* Tennessee Constitution Article X, Section 1.

51. On or about March 12, 2020, the Governor issued Executive Order No. 14, which included a declaration of state of emergency in response to the threat of the spread of the SARS-Coronavirus 2, which causes COVID-19.

52. Upon issuing such declaration, the Governor erroneously believed such afforded him the authority of all three branches of the government in that he simply had to sign an executive order and thereby usurp citizens' personal and economic rights and liberties without limitations and without checks or balances from other government officials or branches of the government.

53. Plaintiffs and their employees and agents face criminal prosecution if they violate any of the Governor's Executive Orders as pursuant to Tenn. Code Ann. § 58-2-120 a violation of an order or rule promulgated by the Governor during a declared emergency is a Class A misdemeanor, which is punishable by fines and imprisonment of up to 11 months and 29 days.

–8–

54.    Given the aforementioned statute, the Governor effectively criminalized a citizen or business owner exercising many of their fundamental rights and liberties, such as, the right to travel, the right to choose one's occupation of life, the right to association, the right to assemble, the right to worship and many other fundamental and natural rights citizens of America enjoy.

55.    The Governor's approach and manner of issuing executive orders is not supported by the Tennessee Constitution nor the U.S. Constitution, both of which the Governor swore to uphold.

56.    On March 22, 2020, the Governor issued Executive Order No. 17. Relying on Tenn. Code Ann. § 58-2-107 and declaring, *inter alia*, the Governor had the right to "make orders concerning the entry and exits and occupancy of premises within an emergency area", the Governor ordered the closure of "restaurants, bars, gyms, fitness centers and other similar facilities."

57.    Executive Order No. 17 was effective at 12:01 a.m. on March 23, 2020 through 12:01 a.m. on April 6, 2020.

58.    Executive Order No. 17, prohibited "social gatherings" of ten or more people.

59.    Executive Order No. 17 acknowledged indirectly the impact that COVID-19 has on the older population, but did not mandate the quarantining of any such individuals or the limitation of travel of such segment of the population.

60.    Executive Order No. 17 provided no scientific data or reasoning for the severity of restrictions on citizens and businesses and merely alluded to the fact that the Center for Disease Control and Prevention ("CDC") has stated that COVID-19 is frequently spread "between people who are in close contact with one another (within about 6 feet)."

61.    The Governor's representation of the CDC's statement in EO No. 17 and other executive orders was a misstatement of the CDC's position on social distancing, which was as follows: "COVID-19 spreads mainly among people who are in close contact (within about 6 feet) **for**

–9–

**a prolonged period**."(emphasis added).

62. On March 30, 2020, the Governor issued Executive Order No. 22. Therein, relying on Tenn. Code Ann. § 58-2-107(e), *inter alia,* the Governor issued a recommendation that Tennesseans stay at home "as much as possible", unless engaging in "Essential Activity" or "Essential Services".

63. Executive Order No. 22 was effective at 11:59 p.m. on March 31, 2020 through 11:59 pm on April 14, 2020.

64. Executive Order No. 22 vaguely defined "Essential Activity" and "Essential Services" with no rational basis to the goal of reducing the ultimate amount of sickness and death caused by COVID-19.

65. The Governor attempted to explain and define "Essential Services" in several paragraphs in his Executive Order and in an attachment, which was six (6) pages long.

66. The explanation of "Essential Services" was vague and would not give notice to an ordinary person whether his or her activity was in violation of the Executive Order.

67. Further, the explanation of "Essential Service" was inconsistent and illogical as such excluded gathers of more than ten (10) people, but without limitations defined the following as "Essential Services": farm and produce stands, government services, newspapers, radio, educational institutions, bicycle shops, liquor stores, painting services, dry cleaners and marinas.

68. Executive Order No. 22 additionally mandated that "non-essential businesses" cannot be open to the public.

69. The definition and explanation of "non-essential businesses" was vague and had no rational basis to reducing the ultimate sickness and death caused by COVID-19.

70. In Executive Order No. 22, the Governor additionally cited as part of his reasoning: the "burden on health care resources".

–10–

71.     At the time the Governor issued EO No. 22, there were no reliable projections that the healthcare system would be burdened if the Governor did not invoke extreme measures in restricting individuals and businesses.

72.     Upon information and belief, the Governor was relying on statistics which erroneously projected that 20% to 30% of individuals who contracted COVID-19 would need to be hospitalized.

73.     On March 31, 2020 the date of Executive Order No. 22 was issued, the Tennessee Department of Health reported that there were 2,239 confirmed cases of COVID-19 and only 175 individuals required hospitalization, which is a 7.8% hospitalization rate.

74.     Upon information and belief, the Governor and the Tennessee Department of Health were aware that scientists were estimating that the number of individuals infected was 50% to 80% higher than the reported cases, which would reduce the actual hospitalization rate to 4.3% on March 31, 2020.

75.     Government officials made efforts to establish a temporary medical facility at the Music City Center in Nashville, Tennessee which consisted of nearly 1,400 hospital beds, but recently announced such beds were never needed and indicated the temporary facility has been disassembled.

76.     The most recent data provide by the Tennessee Health Department states that there have been 14,096 confirmed COVID-19 cases and 1,266 hospitalizations. This yields a hospitalization rate of 8.9%.

77.     Given the lack of testing and other relevant factors, the actual hospitalization rate could be as low as 4.9%.

78.     If the Defendants quarantined the elderly or the infirmed who are more susceptible to

–11–

the effects of COVID-19, such would severely limit the strain on the hospitals as the CDC has reported, on average, patients older the age of 50 make up 75% of patients hospitalized as a result of COVID-19.

79.     At the time of issuing the Executive Order No. 22, the data and science were available regarding the effects of COVID-19 and such demonstrated that over 93% of individuals who died from COVID-19 were over the age of 60 and/or had a serious underlying medical condition.

80.     Executive Order No. 22 did not address any specific restrictions on those who were over the age of 60 or had certain underlying medical conditions.

81.     Despite the unprecedented breadth and reach of EO No. 22 and the deadly characteristic of COVID-19, the Executive Order failed to mandate the quarantining or even the self-isolation of individuals who had been diagnosed with COVID-19.

82.     Executive Order No. 22 did not mandate the reporting or testing of individuals with symptoms indicating they were infected with COVID-19.

83.     Executive Order No. 22 did not mandate guidelines for continuing disinfection or terminal disinfection.

84.      Executive Order No. 22 did state, "because protecting personal liberty is deeply important, this Order is not a shelter-in-place mandate . . ."

85.     On March 30, 2020, the Governor signed Executive Order No. 23, which mandated, "all persons in Tennessee are required to stay at home, except when engaging in Essential Activity or Essential Services as defined in the Order."

86.     When announcing the unprecedented lock down of American citizens in their homes, the Governor referred to cell phone and traffic data which he claimed demonstrated an increase in traffic since issuing Executive Order No. 22.

–12–

87.     In making his statements,  the Governor did not cite to any evidence which demonstrated that those traveling on the interstate were not in compliance with his previous Orders and indeed Governor Lee reportedly stated about the increase in traffic, "It's hard to know why that has happened. We just know that it has."

88.     Upon information and belief, the Governor issued EO No. 23 without any scientific evidence or reasoning related to reducing the ultimate sickness and death caused by COVID-19 and/or such measure were not in the least restrictive means possible.

89.     On April 28, 2020, the Governor issued Executive Order No. 30 which was to be effective at 12:01 a.m., April 29, 2020 through 11:59 p.m. on May 29, 2020.

90.      Executive Order No. 30 specifically superseded and repealed EO No's 17, 21, 22, 23, 27 and 29, which included lifting the "stay-at-home" mandate.[1]

91.     Executive Order No. 30 directed that restaurants, including those designated under state law as "limited service restaurants", were allowed to provide dine-in services, provided they follow the "ERG Guidelines" for restaurants.[2]

92.     Executive No. 30 continued to prevent "social or recreational gatherings of ten (10) or more people".

93.     Executive Order No. 30 asserted that "the threat of COVID-19 remains very serious".

94.     For the first time in any order issued by the Governor, persons who tested positive for COVID-19 were directed to "stay home, except to receive medical care."

---

[1] On April 24, 2020, the Governor issued Executive Order No. 29 titled: An Order Amending Executive Order No. 17 to Reopen Dine In  Restaurant. Similar to EO No. 30 it addressed re-opening restaurants for dine-in only in eighty-nine (89) counties. This EO was explicitly superseded and repealed by EO No. 30.

[2] On May 7, 2020, the Governor issued Executive Order No. 35, which allowed "Non-contact Recreation Businesses" to open, but still mandated that bars, night clubs and live performance venues remain closed.

–13–

95.     Executive Order No. 30 provided no reporting, testing or disinfection requirements of individuals who tested positive for COVID-19 or any other mechanism to monitor such individuals.

96.     For the first time since issuing a declaration of emergency, the Governor ordered in EO No. 30 that individuals "shall not visit nursing homes, retirement homes, long-term care facilities, or assisted living residents . . .."

97.      For the first time since issuing a declaration of emergency, the Governor in EO No. 30 "urged" persons to wear cloth face covering or similar coverings in public settings.

98.     The re-opening of restaurants pursuant to EO No. 30 only applied to 89 counties and did not apply to the following counties: Davidson, Hamilton, Knox, Madison, Shelby, and Sullivan.

99.     Executive Order No. 30 cited to the fact that the aforementioned counties had "locally run county health departments".

100.    Executive Order No. 30 stated that the directives related to dental or medical procedures could not be superseded by a local order "absent authority delegated by the Governor."

101.    The Governor's disparate treatment of individuals and businesses in larger counties is not consistent with the scientific data which demonstrates that those in smaller counties are at greater risk to the effect of COVID-19 as medical treatment is not as readily available.

102.    The Governor's disparate treatment of individuals and businesses in larger counties is illogical and unscientific as nothing within EO No. 30 prevents citizens of the excluded counties from patronizing restaurants in the other 89 counties.

103.    The Governor's disparate treatment of individuals and businesses in larger counties is not supported by the scientific data as the larger counties have similar death rates as other counties.

104.    The percentage of the population who have died from COVID-19 for Davidson County and contiguous counties is as follows:  Davidson: .0042%; Rutherford: .0035%; Sumner:

–14–

.0212%; Wilson: .0037%; Williamson: .0037%.

105. The Governor's disparate treatment of individuals and businesses in larger counties is not supported by the scientific data provided by Vanderbilt University Medical Center which found that all 96 counties of Tennessee had a transmission rate of 1.0, which is the average number of individuals to whom an infected individual would transmit the disease.

106. While the Governor via EO No. 30 has repealed previous executive orders which included certain terms and conditions which were in deprivation of Plaintiffs' fundamental rights and civil liberties, there is a reasonable expectation that Plaintiffs may face the same deprivation of fundamental rights and civil liberties in the future.

107. The Governor has asserted publicly his actions were "constitutional" and, thus, it is unlikely the Governor will allow the applicable constitutions or the law to prevent a future re-instatement of his unconstitutional orders.

108. The Governor has asserted that COVID-19 is still a "serious condition".

109. The Governor has asserted that the "stay at home" mandate and the closure of business was intended to "flatten the curve", which references the rate of increase in the number of cases.

110. The scientific community and government officials agree that by lifting some of the restrictions found in the Governor's previous Orders, a high probability exists that the number of cases will increase.

111. There is a reasonable expectation that the Governor will determine there is a need for a second effort to "flatten the curve" pursuant to strict, unconstitutional mandates.

112. The Governor's executive orders by law expire in sixty (60) days unless otherwise indicated or extended. *See* Tenn. Code Ann. § 58-2-107(b)(2).

−15−

113.     As the legal challenges to the Governor's Executive Orders will take longer than sixty (60) days, Plaintiffs have the right to have the issues set forth herein adjudicated by this Court notwithstanding such Orders may expire.

### C.     METROPOLITAN NASHVILLE-DAVIDSON COUNTY'S ORDERS

114.     On March 15, 2020, the Metropolitan Board of Health issued a Declaration of Emergency based on the threat of COVID-19.

115.     The Declaration relied on the Board's authority, *inter alia*, to investigate and control communicable diseases as granted by the Metropolitan Charter in Article 10, Chapter 1, Section 10.103.

116.     The Declaration also relied on Tenn. Code Ann § 68-2-609 and stated the Board has authority to order "closure of any public establishment, facility or building, if the public health officer is otherwise authorized by law to take that action."

117.     The Declaration does not cite to the law which authorizes the Metro Board of Health to close certain types of businesses on a wholesale basis as such law does not exist.

118.     The Declaration states prior to issuing its orders, the Board consulted with Governor William B. Lee and Mayor John Cooper.

119.     The Declaration addresses individuals who have traveled to areas flagged by the CDC or those who have been in close contact with such individuals and states if they display symptoms they should "self-isolate".  The Declaration takes no steps to direct the quarantining or monitoring of such individuals.

120.     The Declaration does not mandate the quarantining of those who may be infected or the testing of those who may suspect they are infected.

121.     The Declaration only reminds health care professionals that they are to report

–16–

suspected cases of COVID-19, but does not direct that such infected individuals must be quarantined or otherwise monitored.

122.    The Declaration does not explicitly require the implementation of the disease control ordinances or the procedures and protocols found in the Rules of the Tennessee Department of Health or similar procedures and protocols.

123.    Instead of using quarantine, reporting or monitoring as a tool, the Board instead directed the Chief Medical Director to effectively close all bars and compel restaurants to reduce their capacity to fifty (50%) percent.

124.    On March 18, 2020, Mayor John Cooper issued Executive Order No. 006, titled Declaration of a State of Emergency Related to the COVID-19 Epidemic, citing Tenn. Code Ann. §§ 58-8-104 & 105 and 58-2-110.[3]

125.    The Mayor's Declaration of Emergency states in pertinent part, "The Metropolitan Chief Medical Officer and Chair of the Metropolitan Board of Health are directed to confer regularly with the Mayor regarding the likelihood that public protection from COVID-19 epidemic may require curfew, shelter-in-place order, or other restrictions on travel within Davidson County."

126.    None of the Tennessee statutes upon which the Mayor relied in his Declaration afford him the authority to issue "shelter-in-place" orders or restrict travel, except the authority to evacuate a particular area.

127.    Upon information and belief, each of the orders issued by the Chief Medical Director of Health for Metropolitan Nashville-Davidson County, Michael C. Caldwell, were at the direction

_____

3 Pursuant to Tenn. Code Ann. § 58-2-110(3)(A)(v), an emergency declaration is only valid for seven (7) days, but may be extended.  Pursuant to Executive Orders 006A-F, the Mayor extended the Declaration of State of Emergency through seven (7) days from April 29, 2020.

–17–

of or with the explicit approval of Defendant Mayor John Cooper.

128.    In response to the Board's Declaration of Emergency, on March 17, 2020, the Chief Medical Director issued Health Director Order 1: Suspending Bars and Limiting Restaurant Capacity.

129.    Health Director Order 1 did not cite any authority or scientific data or reasoning, but directed that those business which primarily serve alcohol must close.

130.    Health Director Order 1 directed restaurants to limit capacity to one half and to space tables and seating to maximize distance between patrons.

131.    Health Director Order 1 mandated that restaurants were required to limit the "bar area" to ten percent and prohibited standing.

132.    The directives in Health Director Order 1 were unduly vague as an ordinary person could not discern whether he or she was in compliance with the order.

133.    On or about March 20, 2020, the Chief Medical Officer issued Health Director Order 1A: Suspending Restaurant Dining Rooms.

134.    Health Director Order 1A effectively prohibited restaurants from serving patrons on premises and limited sales to carry out or delivery.

135.    The discrimination against bars and restaurants found in Health Director Orders 1 and 1A had no rational basis to the goal of ultimately reducing the ultimate sickness or death caused by COVID-19.

136.    Health Director Orders 1 and 1A did not provide any direction or mandate related to identifying or quarantining those infected with COVID-19 or protecting the vulnerable segments of the city's population.

137.    On March 23, 2020, the Chief Medical Director issued Health Director Order 3: Safer

–18–

at Home. Such "urged" citizens to "shelter at home as much as possible" and directed that citizens should remain six feet apart from one another.

138.   While Health Director Order 3 uses the word "urge", Metro intended that such shelter-in-place order be mandatory.

139.   On Metro's website, it states, "To combat the spread of COVID-19, the Metro Public Health Department has issued a Safer at Home Order directing all residents of Nashville and Davidson County to stay inside their homes unless they are engaged in certain 'essential activities.'"

140.   Health Director Order 3 prohibited gatherings of more than ten (10) people.

141.   Health Director Order 3 closed all businesses not performing "essential services". The closure included a list of businesses, including, entertainment venues and public social clubs.

142.   Health Director Order 3 listed business which provided "essential services", which without limitation, included all federal, state and local agencies and individuals performing under contracts with federal, state and local agencies.

143.   The description and distinction of "essential business" and "non-essential businesses" in Health Director Order 3 has no rational basis to the goal of reducing the ultimate sickness and death caused by COVID-19.

144.   The description of "essential business" and "non-essential business" found in Health Director Order 3 was unduly vague as an ordinary person could not discern whether he or she was in compliance with the order.

145.   On April 1, 2020, the Chief Medical Director of Health issued Health Director Order 3: Safer at Home (Amended and Restated). Such Order was similar to the previous Order, with minor changes.

146.   On April 30, 2020, the Chief Medical Director extended Health Director Order 3 until

–19–

May 8, 2020.

147.    On May 8, 2020, Chief Medical Director issued Health Director Order 5: Phase One-Re-Opening, which was to be effective from 12:01 a.m. on May 11, 2020 through 11:59 p.m. on May 31, 2020.

148.    Health Director Order 5, *inter alia*, allowed restaurant and bars to open at 50% capacity with social distancing and the implementation of other CDC guidelines.

149.    Health Director Order 5 allowed the service of alcohol at tables, but required all bar areas to remain.

150.    Health Director Oder 5 prohibited live music without a rational basis  as musicians are routinely up on a stage or in an area away from the public.

151.    The prohibition on live music is further without a rational basis as the presence of musicians playing live music  in no way affects the 50% occupancy requirements or the other safety precautions promulgated by the Chief Medical Director.

152.    Health Director Order 5 allowed, without limitations, the following entities or establishments to remain open: federal and state offices, farmers markets, real property services, landscaping, bicycle repair, beverage stores, media, construction, architectural and surveying services.

153.    Despite the Chief Medical Director's heavy focus on restricting activity in bars and restaurant, Health Director Order 5 makes no attempt to compel reporting, disinfection or quarantining consistent with the communicable disease laws and regulations.

154.    Despite the undisputed scientific data that COVID-19 primarily affects those over the age of 50 or with weaken immune systems, Health Director Order 5 does not restrict the activity of these vulnerable segments of the population.

155. Health Director Order 5 acknowledges that those age 65 or older are at "high-risk", but only "urges" them to shelter at home.

156. Metro has issued guidelines to reopening business in Nashville which is based on four phases. Each of the phases must meet specific fourteen-day trends.

157. Metro's guidelines state clearly that while Nashville is re-opening businesses, if the rate of infection or number of infections increases, returning to previous stages may be required.

158. Metro has asserted each of its orders are constitutional and lawful.

159. Notwithstanding the Health Director Order 3 as amended expired on May 8, 2020, a reasonable expectation exits that Plaintiff will be subjected to the same deprivation of his rights and liberties by Metro with the same or similar directives.

160. Metro has erroneously taken the position that its Orders can be for unlimited periods of time, but seems to be limiting such Orders to thirty (30) days.

161. As the legal challenges to such orders will take longer than thirty (30) days, Plaintiffs have the right to have the issues set forth herein adjudicated by this Court notwithstanding such Orders may expire or have expired.

## D. COMMUNICABLE DISEASE LAWS AND REGULATIONS

162. The Tennessee General Assembly, the Tennessee Department of Health and Metro Council have passed comprehensive and effective laws and measures to deal with infectious, communicable diseases.

163. The extraordinary restraint on individuals' freedom and liberties promulgated by the government as set forth herein is not the least restrictive means possible as Defendants have failed to fully employ the detailed, scientific methods set forth in disease control laws and regulations and/or failed to use fully the lawful authority to restrain or monitor those who have been infected with

–21–

COVID-19 or who are more susceptible to COVID-19.

164. The Tennessee General Assembly beginning in 1905 passed legislation to address the prevention of communicable diseases. The current form of such laws can be found at Tenn. Code Ann. § 68-5-101 et seq..

165. Tennessee law requires that whenever "any case of communicable disease exists . . . or is even suspected to exist in any household, it is the duty of the head of the household, or any other person in the household possessing knowledge of the facts, immediately to notify the municipal or county health authorities . . ." *See* Tenn. Code Ann. § 68-5-101.

166. Notwithstanding the aforementioned statute, none of the Defendants took any public measures or issued any public directives to enforce this crucial aspect of disease control.

167. Tennessee law provides that upon being provided notice of a communicable disease, "it is the duty of all municipal or county health authorities, without delay . . to proceed to carry out such rules and regulations as the department of health may prescribe, having for the objection the prevention and restrictions of such diseases." *See* Tenn. Code Ann. § 68-5-103.

168. Tennessee law further provides, "It is the duty of the local health authorities, on receipt of a report of a case, or suspected case, of disease declared to be communicable . . to be subject to isolation or quarantine, to confirm or establish the diagnosis, to determine the source or cause of the disease and to take such steps as may be necessary to isolate or quarantine the case or premise upon which the case, cause or source may be found, as may be required by the rules and regulations of the state department of health." *See* Tenn. Code Ann. § 68-5-104(a)(1).

169. Under Tennessee law it is a Class B misdemeanor for any person who is isolated or quarantined in accordance with the law or regulation to willfully escape. *See* Tenn. Code Ann. § 68-5-104(a)(2).

170. Further under Tennessee law, the Commissioner of Health has broad authority to "declare quarantine whenever, in the commissioner's judgment, the welfare of the public requires it." *See* Tenn. Code Ann § 68-1-201.

171. The Commissioner of Health also may prescribe rules and regulations as may be deemed proper to prevent the spread of epidemic diseases in the state. *See* Tenn. Code Ann. § 68-1-201(2).

172. Notwithstanding the broad authority given to the Commissioner of Health, Tennessee law is clear that "[w]henever . . . epidemic diseases appear within any locality within the state . . .the commissioner shall prepare and carry into effect such rules and regulations as, in the commissioner's judgment will, ***with the least inconvenience to commerce and travel,*** prevent the spread of the disease." *See* Tenn. Code Ann. § 68-1-201(1)(emphasis added).

173. Instead of following the law passed by the Tennessee General Assembly and allowing the Commissioner of Health to use the regulations and rules passed by the Department of Health or make additional rules or regulations which were the least inconvenience to commerce and travel, the Governor elected to operate outside his Constitutional authority and promulgate orders which were not as effective as the aforementioned laws and regulations.

174. Pursuant to Tenn. Code Ann. § 68-1-201(2), the Tennessee Department of Health, beginning in 1974, promulgated rules and regulations to address communicable diseases. Such can be found in the Rules of the Tennessee Department of Health ("TDOH"), Chapter 1200-14-01.

175. The rules, consistent with Tennessee law, require that all healthcare providers and "other persons" knowing or "suspecting" a case of a reportable disease shall report such to the Department of Health. *See* TDOH Rule 1200-14-01.02(1).

176. The rules further require that when an attending physician discovers or "suspects" a

–23–

case of communicable disease, he is to inform the head of the household and the appropriate healthcare facility and "instruct these person of such isolation of patient and concurrent disinfection as may be necessary to prevent the spread of the disease." *See* TDOH Rule 1200.04-01.06(1).

177.    The aforementioned rule also states unambiguously that the regulation is to be construed that a physician or other persons duly authorized under applicable state law "has the authority to establish quarantine, or isolation" for communicable diseases. *See* TDOH Rule 1200.04-01.06(1).

178.    "Isolation" is defined as "The separation for the period of communicability of infected person, or persons reasonably suspected to be infected, from other persons . . .as will prevent the direct or indirect conveyance of the infectious agent from infected persons to other persons . . ." (emphasis added). *See* TDOH Rule 1200-14-01.01(1)(s).

179.    "Quarantine" is defined as "Limitation of freedom of movement or isolation of a person or preventing or restricting access to premises upon which the person . . .may be found . . . . These limitation may be accomplished by placing a person in a healthcare facility or a supervised living situation, by restricting a person to the persons' home . . ." *See* TDOH Rule 1200-14-01.01(1)(w).

180.    The rules, under title "General Measures for the Effective Control of Reportable Diseases", provide that when a local health officer receives a report of a "reportable disease or of a suspected epidemic of a disease or of a suspected case of a disease of public health significance", he or she "shall" confer with the medical personnel making the report. *See* TDOH Rule 1200-14-01.15(1)(a).

181.    The local health officer also "shall" collect specimens to confirm diagnosis "or find the source of the infection or epidemic." *See* TDOH Rule 1200-14-01.15(1)(b).

–24–

182.     The local health officer also "shall" obtain all names and information necessary to identify and "contact all persons potentially exposed to the source of the disease outbreak as needed to protect the public health". *See* TDOH Rule 1200-14-01.15(1)(c).

183.     The local health officer further shall "[m]ake a complete epidemiological investigation to include a review of records of the affected person, interview the affected person" and record the finding on a communicable field record. *See* TDOH Rule 1200-14-01.15(1)(d)

184.     The local health officer also "shall" establish appropriate control measures which may include "isolation", "quarantine", and "disease surveillance". *See* TDOH Rule 1200-14-01.15(1)(e).

185.     The rules further provide that it "shall be the duty of the local health officer, prior to the release from official isolation or quarantine of any case of communicable disease to have instituted such terminal disinfection and cleansing measures as he may deem necessary".   *See* Rule 1200-14-01.21.

186.     Pursuant to and similar to Tennessee state law, Metro's Code of Ordinances provides specific methods and authority to the chief medical director and the Metro Department of Health to handle deadly, communicable diseases. The ordinances related to disease control can be found at Metro Code of Ordinances, Chapter 10.16 et seq..

187.     The Disease Control ordinances specifically classify various contagious, infectious communicable and dangerous disease. These include Malaria, Plague, Typhoid Fever, Yellow Fever, Rheumatic Fever, Influenza and other diseases.   *See* Metro Ordinance § 10.16.020(A).

188.      Upon a physician or "other person" knowing of such disease such shall be reported to the chief medical director or the department of health. The ordinances likewise places a duty on other entities, including schools, to report such diseases. *See* Metro Ordinance § 10.16.020(B)

189.     Upon notification of a communicable disease, the chief medical director is to make

contact with the person infected and inquire into the circumstances surrounding the disease. *See* Metro Ordinance § 10.16.030(A)

190.    Further, the medical director is to "establish and maintain" quarantine,  isolation or use other methods of control of the infected individual. *See* Metro Ordinance § 10.16.080

191.    The aforementioned State and Metro laws, rules and regulations are a clear and precise path to the control of communicable diseases such as COVID-19, which is based on decades of experience, scientific studies and data and proven methods of disease control.

192.    Instead of following the scientific methods set forth in the law and regulations which focuses on those who are infected or may be infected, the Defendants effectively employed a method of quarantining large segments of the population who were not infected or who would only be minimally impacted if they were infected.

193.    Further, the Defendants failed to enforce the laws and regulations which required the reporting and investigation of cases of COVID-19 or suspected cases.

194.    In fact, many aspects of the Defendants' Order countered the law and the well-established scientific methods set forth in the rules and regulations.

195.     On the Tennessee Department of Health's website in the Frequently Asked Questions tab, in response to the question, "Where can I get tested?", the TDOH provides the following answer, "The 'safer at home' order requires all residents of Tennessee to stay at home and limit all activity to essential services only."

196.    Without mandating reporting or testing, Defendants were unable to follow the methods and guidelines set forth in the applicable disease control laws and regulations as Defendants could not perform epidemiological investigations and contact interviews.

197.    Defendants also failed to follow the scientific methods set forth in the applicable

–26–

disease control laws and regulations by not mandating those who have COVID-19 or who may suspect they have COVID-19 to remain quarantined or isolated.

198.    Defendants' Orders merely suggested those with COVID-19 "self-isolate" and Defendants has not made public any plan or procedure for ensuring those who should be quarantined or isolated remained so.

199.    Outside those who were hospitalized, Defendants' Orders and directives did not have any public plan or procedure for continuing disinfection or terminal disinfection or other methods to ensure that those who were infected or were suspected of infection were indeed free of the disease and would not spread such to others upon re-entry into the public.

200.    Defendants' plan to quarantine each citizen, including those who were not infected or who were not susceptible to the disease, except when performing "essential activity", was not consistent with State or local laws or regulations addressing communicable diseases and, therefore, was not the least restrictive means possible.

## CAUSES OF ACTION

## COUNT I:   42 U.S.C. § 1983, VIOLATIONS OF THE SUBSTANTIVE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT

201.    Plaintiffs incorporate by reference herein the allegations set forth in the preceding numbered paragraphs and do further allege as follows:

202.    42 U.S.C. § 1983 states in pertinent part, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

–27–

Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .."

203. The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution states: "No state shall . . .deprive any person of life, liberty, or property, without due process of law . . .".

204. The Ninth Amendment of the U.S. Constitution reads, "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

205. Each American citizen enjoys certain inalienable, fundamental rights, both enumerated and unenumerated in the U.S. Constitution, which are "essential to the orderly pursuit of happiness by free men." *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972)

206. Plaintiff has a fundamental right under the U.S. Constitution and its Amendments,to pursue any common occupation of life, including owning and operating a restaurant and bar, without undue government interference. *See Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

207. Plaintiff has a fundamental right under the U.S. Constitution and its Amendments to travel, both intrastate and interstate, without undue government interference. *See Johnson v. City of Cincinnati,* 310 F.3d 484, 498 (6th Cir. 2002).

208. Plaintiff has a fundamental right under the U.S. Constitution and its Amendments to the freedom of assembly  and association, including developing familial relationships and to gather with individuals for business and political purposes, without undue government interference. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).

209. Plaintiff has a fundamental right under the U.S. Constitution and its Amendments to be free from unreasonable seizure by the government. *See Michigan v. Tyler*, 436 U.S. 499, 504–05

–28–

(1978).

210.     Plaintiff has a fundamental right under the U.S. Constitution and its Amendments to enter into contracts and operate his business under such contracts free from undue government interference. *See U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 22 (1977)

211.     Plaintiff has other such fundamental and natural rights which are not enumerated in the U.S. Constitution, but nonetheless are protected under the law, such as certain economic and property rights. *See* Ninth Amendment of the U.S. Constitution.

212.     Plaintiff's fundamental rights and civil liberties under the U.S. Constitution were violated and he was deprived of such rights, immunities and privileges by the orders, actions and/or omissions of the officials and employees of the State of Tennessee and Metro as set forth herein.

213.     Defendants' actions were not in the least restrictive means possible.

214.     Upon information and belief, in an effort to address the spread of COVID-19, Defendants did not employ the authority and methods afforded under the law to control communicable disease, including, but not limited to, mandating reporting of individuals who were infected with COVID-19 or suspected they were infected with COVID-19, mandating the quarantining or isolation of those who were infected with COVID-19, enforcing quarantine and isolations orders, conducting interviews of those infected or performing contact tracing and testing to limit the spread of COVID-19.

215.     Defendants' Orders and mandates should be declared unconstitutional as science and the law afforded Defendants other reasonable ways to achieve the goal of ultimately limiting the sickness and death caused by COVID-19 which were less burdensome on Plaintiffs' fundamental rights and liberties and which were less drastic. *See Johnson v. City of Cincinnati*, 310 F.3d 484, 503 (6th Cir. 2002).

–29–

216.    As a direct and proximate result of Defendants' actions and/or omissions stated herein, Plaintiffs have suffered injuries and damages.

217.    As a direct and proximate result of Defendants' actions and/or omissions stated herein, Plaintiffs have suffered a deprivation of their fundamental rights, privileges and immunities afforded under the law and seek declaratory and injunctive relief to prevent such further deprivation as requested herein. *See supra.* Count VI & Count VII.


**COUNT II: 42 U.S.C. § 1983, VIOLATIONS OF PROCEDURAL DUE PROCESS CLAUSE OF THE FIFTH AND FOURTEENTH AMENDMENTS**

218.    Plaintiffs incorporate by reference herein the allegations set forth in the preceding numbered paragraphs and does further allege as follows:

219.    The Due Process Clause of the Fifth Amendment states, "No person shall be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

220.    The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution states: "No state shall . . .deprive any person of life, liberty, or property, without due process of law . . .".

221.     Both the State of Tennessee and Metro deprived Plaintiffs of their fundamental rights and civil liberties as set forth herein without a pre-deprivation or post-deprivation hearing.  *See Howard v. Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996).

222.    Defendants' Orders are in violation of the taking clause of the Fifth Amendment as such orders have denied Plaintiff all economically beneficial or productive use of his property and business without just compensation. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015–16

–30–

(1992).

223.     Defendants' Orders are in violation of the Due Process Clause of the Fifth and Fourteenth Amendment as such failed to give reasonable notice of criminal offenses in a manner which is not vague.  *See Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

224.     As a direct and proximate result of Defendants' actions and/or omissions, Plaintiffs have suffered damage and losses.

225.     As a direct and proximate result of Defendants' actions and/or omissions stated herein, Plaintiffs have suffered a deprivation of their fundamental rights, privileges and immunities afforded under the law and seek declaratory and injunctive relief to prevent such further deprivation as requested herein. *See supra.* Count VI & Count VII.

## COUNT III: 42 U.S.C. § 1983, VIOLATIONS OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT

226.     Plaintiffs incorporate by reference herein the allegations set forth in the preceding numbered paragraphs and do further allege as follows:

227.     The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution protects every citizen against intentional, arbitrary government discrimination, whether based on a policy's express terms or improper implementation by government agents. *See Sioux City Bridge Co. v. Dakota Cty., Neb.*, 260 U.S. 441, 445 (1923)

228.     The Defendants' Orders and/or actions deprived Plaintiffs of their fundamental rights as guaranteed under the U.S. Constitution and the amendments thereto.

229.     In addition or in  the alternative, the Supreme Court has recognized successful equal protection claims brought by a "class of one" even if a plaintiff is not of a protected class in which a

−31−

plaintiff alleges that the government has intentionally and without rational basis treated him or her differently from others who are similarly situated. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

230.   The Defendants' Orders and/or actions as set forth herein constitute a violation of the Equal Protection Clause as Plaintiff was treated differently than other businesses and citizens and such was not done in the least restrictive means possible or, in the alternative, such was done without a rational basis.

231.   In addition or in the alternative, Plaintiffs aver that the Defendants' Orders which allow "essential" businesses to remain open, including all government offices and agencies without limitation, but required Plaintiff to close his business were a violation of the Equal Protection Clause of the U.S. Constitution.

232.   In addition or in the alternative, Plaintiffs would aver that Executive Order No. 30 is violation of the Equal Protection Clause as such did not allow Plaintiff to open his business because his business is located in Davidson County.

233.   In addition, or in the alternative, Plaintiffs aver that Defendants' Orders which prohibit live music at Plaintiff's venue is undue discrimination and is in violation of the Equal Protection Clause of the U.S. Constitution.

234.   The disparate and the discriminatory treatment of Plaintiffs set forth herein is not in the least restrictive means possible, or, in the alternative, without a rational basis.

235.   As a direct and proximate result of Defendants' actions set forth herein Plaintiffs suffered damages and injuries.

236.   As a direct and proximate result of Defendants' actions and/or omissions stated herein, Plaintiffs have suffered a deprivation of their fundamental rights, privileges and immunities

–32–

afforded under the law and seek declaratory and injunctive relief to prevent such further deprivation as requested herein. *See supra.* Count VI & Count VII.

### COUNT IV: VIOLATIONS OF THE TENNESSEE CONSTITUTION

237.    Plaintiffs incorporate by reference herein the allegations set forth in the preceding numbered paragraphs and does further allege as follows:

238.    Defendants' actions and omissions as set forth herein were in violation of the Tennessee Constitution.

239.    Governor Lee's Executive Orders were in violation of his oath of office as required under the Tennessee Constitution. *See* Tenn. Const. Art. X, § 1, ( "Every person who shall be chosen . . . to any office of trust or profit under this Constitution . . . . shall, before entering on the duties thereof, take an oath to support the Constitution of this State, and of the United States, and an oath of office.")

240.    Governor Lee's use of power pursuant to Tenn. Code Ann. § 58-2-107(e) in the form of his Executive Orders challenged herein was unconstitutional as such violates the Separation of Powers Clause of the Tennessee Constitution.   *See* Tenn. Const. Art. 2, § 2 ("No person or person belonging to one of these departments shall exercise any of the powers properly belonging to either of the others . . .")

241.    Article 2, Section 1 of the Tennessee Constitution states, "The powers of the Government shall be divided into three distinct departments: the Legislative, Executive, and Judicial."

242.    Article 3, Section 1 of the Tennessee Constitution vests the Supreme Executive Power in "a Governor".

–33–

243.     Article 3, Section 10 states, "[The Governor] shall take care that the laws be faithfully executed."

244.     The Governor is not afforded under the Tennessee Constitution the right to create law without the General Assembly passing a bill.

245.     The Governor's only role in creating law in Tennessee is to approve or refuse to sign any bill which passes both Houses of the General Assembly. *See* Article 3, Section 18 of the Tennessee Constitution.

246.     Notwithstanding the limits of the Tennessee Constitution, the Governor's Orders were executed with the intent to function as a law as the Executive Orders rely on Tenn. Code Ann. § 58-2-107(e), which states the Governor's executive orders "have the force of law" when a state of emergency has been declared.

247.     The Governor's Executive Orders specifically assert that the Governor during a state of emergency has authority to "suspend laws and rules" and make orders "concerning entry and exit and the occupancy of premises" and "take measures concerning the conduct of civilians and the calling of public meetings and gatherings".

248.     The Governor's Executive Orders are an unconstitutional attempt to usurp the General Assembly's power.

249.     The Governor's Executive Orders unlawfully restricted the travel and business activities of Plaintiffs and other Tennessee citizens.

250.     The Governor's Executive Orders and Metro's Health Director Orders were in violation of Article I, Section 25 of the Tennessee Constitution, which prohibits Martial Law.

251.     Martial law is defined in Article I, Section 25 of the Tennessee Constitution as "unrestricted power of military officers ***or others***, to dispose of the persons, liberties or property".

–34–

(emphasis added). [4]

252.    The Defendants' Orders are an attempt at wielding unrestricted power as notwithstanding the unprecedented breadth and invasiveness of their Orders, the Defendants have not sought approval or review of their Orders from any other branch of the government.

253.    Further, the Defendants' Orders dispose of Plaintiffs' civil liberties and property.

254.    The Governor's Executive Orders and Metro's Health Director Orders were in violation of Article 1, Section 7 of the Tennessee Constitution which prohibits unreasonable seizures.

255.    The aforementioned orders effectively seized citizens and their businesses as it severely limited their activities and travel and did so unreasonably.

256.    The Governor's Executive Orders and Metro's Health Director Orders violated Article I, Section 8 of the Tennessee Constitution as such prohibits depriving a citizen of life, liberty or property without due process.

257.    Plaintiffs' fundamental rights and civil liberties were deprived without a pre-deprivation or post-deprivation hearing.

258.    The Governor's Executive Orders and Metro's Health Director Orders are in violation of Article 1, Section 20 of the Tennessee Constitution which prohibits any law from impairing obligations of contracts.

259.    As a direct result of the aforementioned orders, Plaintiffs were unable to meet their obligations under several contracts.

260.    The very breadth and nature of the aforementioned orders are further in violation of

---

4 Article 3, Section 5 of the Tennessee Constitution states the Governor "shall be commander-in-chief of the Army

−35−

the penumbras and implications of the Tennessee Constitution and the natural rights of the people set forth therein.

261.    As a direct and proximate result of Defendants' actions and/or omissions stated herein, Plaintiffs have suffered a deprivation of their fundamental rights, privileges and immunities afforded under the law and seek declaratory and injunctive relief to prevent such further deprivation as requested herein. *See supra.* Count VI & Count VII.

## COUNT V: VIOLATIONS OF TENNESSEE STATUTES

262.    Plaintiffs incorporate by reference herein the allegations set forth in the preceding numbered paragraphs and do further allege as follows:

263.    In the alternative, Plaintiffs aver that the Governor's Executive Orders were in violation of Tenn. Code Ann. § 58-2-107(e) as the authority afforded thereunder to the Governor during the state of emergency was limited to state entities and did not extend the authority to restrict all privately owned business and citizens in the State of Tennessee.

264.    Plaintiffs further aver that the Governor's Executive Orders exceeded the authority afforded the Governor under Tenn. Code Ann. § 58-2-107(e) as such Orders functioned as martial law.

265.    The General Emergency Provision passed by the General Assembly states under the title "Limitations", "Nothing in this chapter shall be construed to: . . . modify . . .the authority of the governor to proclaim martial law or rule or exercise any other powers vested in the governor under the constitution, statutes or common law . . ." *See* Tenn. Code Ann. § 58-2-105(4).

and Navy of this State, and of the Militia . . ."

–36–

266. The Defendants' Orders violated Tenn. Code Ann. § 68-1-201(1), which requires that quarantining utilized to address an epidemic must be in the form of the least inconvenience to travel and commerce.

267. The Defendants' Orders has resulted in a heavy burden on travel and commerce in that at the time of the filing of this Complaint, the Governor's office estimates that 15% of Tennessee workers have filed for unemployment, retail businesses have lost $870 million in net sales and Tennessee GDP has been reduced by $5 billion dollars.

268. Metro's Orders violate Tenn. Code Ann. § 68-2-608, which provides that an individual affected by an order from the county health director must be served with notice and be given the opportunity to be heard.

269. Metro's Orders violate Tenn. Code Ann. § 68-2-609 as the county health officer only has authority to close a public establishment if the officer finds "unsanitary conditions".

270. Plaintiffs have not been served with any orders from Metro.

271. Plaintiffs have not been afforded the opportunity to be heard regarding the closure of their business.

272. Metro's Orders are in violation of Tenn. Code Ann. § 58-2-107 as the Governor has exclusive executive authority to manage an emergency which reaches beyond the boundaries of a local authority, unless the Governor delegates such authority.

273. Metro's Orders are in violation of Tenn. Code Ann. § 58-2-118(a) as Metro's does not have authority to issue orders necessary to manage an emergency unless authorized by the Governor, TEMA or other state department.

274. Prior to the issuance of Metro's Orders, the Governor, TEMA nor any state department delegated the authority to Metro or any official or agency thereof to manage the

–37–

emergency related to COVID-19.

275. As a direct and proximate result of Defendants' actions and/or omissions stated herein, Plaintiffs have suffered a deprivation of their fundamental rights, privileges and immunities afforded under the law and seek declaratory and injunctive relief to prevent such further deprivation as requested herein. *See supra.* Count VI & Count VII.

## COUNT VI: DECLARATORY JUDGMENT

276. Plaintiffs incorporate by reference herein as fully as though set forth verbatim the allegations set forth in the preceding numbered paragraphs and do further allege as follows:

277. This Court is afforded authority pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure to declare rights and other legal relations of any interested party seeking such declaration, whether further relief is or could be sought. Such declaration has the force and effect of a final judgment or decree.

278. Plaintiffs are interested parties seeking declaration of their rights under the U.S. Constitution, the Tennessee Constitution and Tennessee law as the Orders addressed herein have functioned to deprive Plaintiffs of their fundamental rights and have caused them injury and damage, including, but not limited to, the loss of business income and goodwill.

279. Plaintiffs seek a declaratory judgment that Tenn. Code Ann. § 58-2-107(e), which gives the Governor's executive orders the "force of law", is facially unconstitutional as such is in violation of the United States Constitution as set forth in Counts I, II & III.

280. Plaintiffs seek a declaratory judgment that Tenn. Code Ann. § 58-2-107(e), which gives the Governor's executive orders the "force of law" is facially unconstitutional as such is in violation of the Tennessee Constitution as set forth in Count IV.

–38–

281.    Plaintiffs seek a declaratory judgment that the Governor's Executive Orders 17, 21, 22, 23, 27, 29, 30 & 33 as amended and restated and any extensions thereof are in violation of Plaintiffs' fundamental rights as guaranteed by the U.S. Constitution as set forth in Count I.

282.    Plaintiffs seek a declaratory judgment that the Health Director Orders 1, 1A, 2, 3 & 5 as amended and restated and any extensions thereof are in violation of Plaintiffs' fundamental rights as guaranteed by the U.S. Constitution as set forth in Count I.

283.    Plaintiffs seek a declaratory judgment that the Governor's Executive Orders 17, 21, 22, 23, 27, 29, 30 and 33 as amended and restated and any extensions thereof are in violation of Plaintiffs' right to due process under the law as guaranteed by the U.S. Constitution as set forth in Count II.

284.    Plaintiffs seek a declaratory judgment that the Health Director Orders 1, 1A, 2, 3 & 5 as amended and restated and any extensions thereof are in violation of Plaintiffs' right to due process under law as guaranteed by the U.S. Constitution as set forth in Count II.

285.    Plaintiffs seek a declaratory judgment that the Governor's Executive Orders 17, 21, 22, 23, 27, 29, 30 and 33 as amended and restated and any extensions thereof are in violation of Plaintiffs' right to equal protection under the law as guaranteed by the U.S. Constitution as set forth in Section III.

286.    Plaintiffs seek a declaratory judgment that the Health Director Orders 1, 1A, 2, 3 & 5 as amended and restated and any extensions thereof are in violation of Plaintiffs' right to equal protection of the law as guaranteed by the U.S. Constitution as set forth in Count III.

287.    Plaintiffs seek a declaratory judgment that the Governor's Executive Orders 17, 21, 22, 23, 27, 29, 30 and 33 as amended and restated and any extensions thereof are in violation of the Tennessee Constitution as set forth in Count IV.

288.     Plaintiffs seek a declaratory judgment that the Health Director Orders 1, 1A, 2, 3 & 5 as amended and restated and any extensions thereof are in violation of the Tennessee Constitution as set forth in Count IV

289.     Plaintiffs seek a declaratory judgment that the Governor's Executive Orders 17, 21, 22, 23, 27, 29, 30 and 33 as amended and restated and any extensions thereof are in violation of Tennessee law as set forth in Count V.

290.     Plaintiffs seek a declaratory judgment that the Health Director Orders 1, 1A, 2, 3 and 5 as amended and restated and any extensions thereof are in violation of Tennessee law as set forth in Count V.

291.     In addition to the declaratory judgments sought herein, Plaintiffs seek further necessary or proper prospective relief as justice may require pursuant to 28 U.S.C. § 2202.

## COUNT VII: INJUNCTIVE RELIEF

292.     Plaintiffs incorporate by reference herein the allegations set forth in the preceding numbered paragraphs and do further allege as follows:

293.     Rule 65 of the Federal Rules of Civil Procedure affords this Court authority to issue preliminary injunctions or temporary restraining orders which describe in detail the act or acts restrained or required.

294.     Plaintiffs seek a permanent injunction prohibiting the future deprivation of their fundamental rights and the violation of the U.S. Constitution, the Tennessee Constitution and Tennessee law as alleged herein.

295.     Upon a motion and a hearing, Plaintiffs seek a temporary restraining order prohibiting Defendants from enforcing any prohibition of live music as such is effectively a closure of Plaintiffs'

–40–

business and constitutes a deprivation of Plaintiffs' fundamental rights and a taking of his business without due process of the law.

296. If Defendants reinstate any of their Orders challenged herein and thereby mandate that Plaintiff cannot leave his home or otherwise restrict his travel, Plaintiff reserves the right to seek a temporary restraining order prohibiting the Defendants from enforcing such orders.

297. If Defendants reinstates any of their Orders challenged herein and thereby mandate that Plaintiffs cannot operate their business, Plaintiffs reserves the right to seek a temporary restraining order prohibiting the Defendants from enforcing such orders.

298. Plaintiffs' request for injunctive relief does not seek the repeal of orders or directives from any government authority which require social distancing, wearing masks, gloves or other protective gear, sanitary guidelines or other reasonable and scientific means of preventing the spread of COVID-19.

299. Plaintiffs are entitled to the requested temporary restraining orders as a likelihood exists that Plaintiffs will prevail on the merits of this matter as the Orders referenced herein have placed severe restrictions and limitations on Plaintiffs in an unprecedented manner which has resulted in the deprivation of their fundamental rights which has not occurred in America's recent history.

300. Plaintiffs are likely to succeed on the merits as the Sixth Circuit Court of Appeals has opined in a recent decision that, as a preliminary matter, the Governor's Executive Orders were an unconstitutional restraint on a woman's fundamental right to make health decisions related to her pregnancy. *See Adams & Boyle, P.C. v. Slatery*, No. 20-5408, 2020 WL 1982210, at *9 (6th Cir. Apr. 24, 2020).

301. Importantly, the Sixth Circuit Court of Appeals rejected the assertion by the State that

–41–

it was not in the court's purview to determine which method the State chose in addressing health and safety issues. *See Adams & Boyle, P.C. v. Slatery*, No. 20-5408, 2020 WL 1982210, at *9 (6th Cir. Apr. 24, 2020) ( "And although the State cites language in *Jacobson* stating, "[i]t is no part of the function of a court or a jury to determine which one of two [responses] [is] likely to be most effective for the protection of the public against disease," . . . .and suggests that this means we must defer uncritically to the State's *ipse dixit* that a three-week bar on procedural abortions is necessary to save critical PPE and preclude risky interpersonal contact, *. . .* neither *Jacobson [v. Massachusetts]* in particular, nor Supreme Court abortion precedent in general, requires such abdication.")(citations omitted).

302.     Plaintiffs aver that the continue enforcement of the governmental orders referenced herein will cause Plaintiffs irreparable harm.

303.     The deprivation of a Plaintiffs' fundamental rights preserved by the U.S Constitution or the Tennessee Constitution as set forth herein, even if such infringement is minimal, by law constitutes irreparable harm.

304.     The continued closure of Plaintiff's business will cause irreparable harm to the reputation, good will and financial health of his business.

305.     The granting of the injunctions sought herein will not cause substantial harm to others as, indeed, many citizens of Tennessee have suffered the same deprivation of his or her fundamental rights as set forth herein and the granting of the temporary restraining order will cease the irreparable harm caused to such citizens.

306.     The granting of the injunctions sought herein will not cause substantial harm to others as Plaintiffs do not seek the repeal of orders or directives from any government authority which relate to quarantining those infected with COVID-19, epidemiological investigations of COVID-19

–42–

cases, social distancing, wearing masks, gloves or other protective gear, sanitary guidelines or other reasonable and scientific means of preventing the spread of COVID-19.

307. Plaintiffs further aver that a temporary restraining order is in the public interest as the prevention of the deprivation of citizens' fundamental rights and civil liberties is always in the public's best interest.

308. The government has at its disposal the mechanisms and authority created under the law to control the effects of COVID-19 and, thus, restraining the enforcement of the government orders addressed herein will not diminish such authority or effectiveness of the mechanisms put in place under the law and the government can effectively prevent harm to others and move forward in the public's best interest even if such restraining orders are issued.

**WHEREFORE**, **PREMISES CONSIDERED**, Plaintiffs pray that proper process issue and be served upon Defendants, requiring them to answer the Complaint within the time prescribed by law and further Plaintiffs request:

1. A declaratory judgment that Defendants' actions as set forth herein were in violation of the United States Constitution, the Tennessee Constitution and/or applicable Tennessee state law and deprived Plaintiffs of their rights, immunities and privileges afforded thereunder as set forth in Count VI.

2. A preliminary and permanent injunction preventing future deprivation of Plaintiffs' fundament rights and other rights afforded under the law by Defendants' Orders as alleged herein;

3. That the Defendants be required to pay Plaintiffs' reasonable attorney's fees related to the pursuit of prospective relief pursuant to 42 U.S.C. § 1988 and the equitable powers of this Court;

4. That the Defendants be required to pay the Plaintiffs' discretionary costs and court costs of this action;

–43–

5.    For any other general and further relief as may be considered by this Court and as justice may require.

Respectfully submitted,

**SOVEREIGNTY LEGAL FOUNDATION**

 **/s/ Kirk L. Clements**
**KIRK L. CLEMENTS, BPR NO. 20672**
Attorney for Plaintiffs
105 Broadway, St. 2
Nashville, TN 37201
615-964-8000
615-953-1902 (fax)
kirk@sovereigntylegal.org

−44−